# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
Filed: April 25, 2022

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | | |
| DORETHA ROBINSON, | * | No. 19-1254 |
| | * | |
| Petitioner, | * | Special Master Sanders |
| v. | * | |
| | * | Attorneys' Fees and Costs; |
| SECRETARY OF HEALTH | * | Reasonable Basis; Influenza ("Flu") |
| AND HUMAN SERVICES, | * | Vaccine; Transverse Myelitis ("TM") |
| | * | |
| Respondent. | * | |
| * * * * * * * * * * * * * * | | |

*Kimm Hudley Massey,* Massey Law Group, Bowie, MD, for Petitioner.
*Voris Johnson*, U.S. Department of Justice, Washington, DC, for Respondent.

## ATTORNEYS' FEES AND COSTS DECISION[1]

On August 22, 2019, Doretha Robinson ("Petitioner") filed a petition for compensation pursuant to the National Vaccine Injury Compensation Program ("Program" or "Vaccine Program").[2] Pet. at 1, ECF No. 1. Petitioner alleged that the influenza ("flu") vaccine she received on October 19, 2016, caused her to develop transverse myelitis[3] ("TM"). *Id.* On December 15, 2020, Petitioner filed a motion to dismiss. Pet'r's Mot. to Dismiss, ECF No. 23. I granted Petitioner's motion and dismissed her claim on December 17, 2020. *See* Decision, ECF No. 24. Petitioner then filed a motion for attorneys' fees and costs on June 11, 2021. Pet'r's Mot. for Attorneys' Fees and Costs at 4, ECF No. 27-1 [hereinafter Pet'r's Mot. for AFC]. Respondent filed a response to Petitioner's motion and objected to an award for fees and costs because he contends that the claim lacks a reasonable basis. Resp't's Resp., ECF No. 28.

For the reasons stated below, I find that Petitioner has not satisfied the statutory

---

[1] This Decision shall be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet**. In accordance with Vaccine Rule 18(b), a party has 14 days to identify and move to delete medical or other information that satisfies the criteria in § 300aa-12(d)(4)(B). Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted Decision. If, upon review, I agree that the identified material fits within the requirements of that provision, such material will be deleted from public access.

[2] The Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-10 et seq. (hereinafter "Vaccine Act," "the Act," or "the Program").

[3] Transverse myelitis is "myelitis in which the functional effect of the lesions spans the width of the entire cord at a given level." *Dorland's Illustrated Medical Dictionary* 1, 1218 (32nd ed. 2012) [hereinafter "*Dorland's*"]. Myelitis is "inflammation of the spinal cord, often part of a more specifically defined disease process." *Dorland's* at 1218.

requirements for an award of attorneys' fees and costs; therefore, I **DENY** Petitioner's motion.

I. **Procedural History and Argument**

Petitioner filed her petition, *pro se,* for compensation on August 22, 2019. Pet. at 1. On September 24, 2019, I held a status conference with Petitioner and Respondent. *See* Min. Entry, docketed Sept. 24, 2019. Petitioner stated that she had spoken to an attorney about her case but wanted "the opportunity to speak to another." Sched. Order at 1, ECF No. 10. Petitioner further stated that "she was familiar with the court's website and resources available to *pro se* litigants." *Id.* I granted Petitioner's request for sixty days "to find and retain an attorney who can represent her in this matter." *Id.* I also gave Petitioner the option to "file a status report outlining her efforts to obtain representation and stating how much additional time is needed to find counsel; or . . . a status report indicating that she intends to proceed *pro se.*" *Id.* Despite a deadline of November 25, 2019, Petitioner filed a motion to substitute attorney Kimm Massey on October 10, 2019. *See* Pet'r's Mot., ECF No. 11.

On January 13, 2020, Petitioner filed several medical records and a statement of completion. Pet'r's Exs. 1–5, ECF Nos. 14–15. Petitioner filed additional medical records on January 16, 2020. Pet'r's Ex. 6, ECF No. 16.

Respondent filed a Rule 4(c) report on June 16, 2020. Resp't's Report, ECF No. 19. Respondent asserted that "[P]etitioner has not provided evidence, in the form of expert testimony or otherwise, to support her contention that the flu vaccine caused her to develop TM (or any other injury)." *Id.* at 8. Respondent continued that no medical theory of causation was presented, "nor did any of [P]etitioner's treating physicians implicate the flu vaccine as the cause of [P]etitioner's condition." *Id.* Lastly, Respondent asserted that "[P]etitioner cannot establish that the onset of her alleged TM occurred in a medically-appropriate timeframe from which to infer causation." *Id.* Specifically, Petitioner's medical records indicate that "the acute onset of her lower extremity weakness occurred over a year after she received her flu vaccination." *Id.* Respondent requested the dismissal of Petitioner's claim. *Id.*

On August 12, 2020, I held a status conference with the parties to discuss the onset issue raised in Respondent's report. *See* Min. Entry, docketed Aug. 12, 2020. Petitioner requested ninety days to "file an expert report and any affidavits addressing [] onset." Sched. Order at 1, ECF No. 21. Petitioner was ultimately unable to obtain an expert and on December 15, 2020, she filed a motion to dismiss. Pet'r's Mot. to Dismiss, ECF No. 23. Petitioner explained that "an investigation of the facts and science supporting this case has demonstrated to Petitioner that she will be unable to prove that she is entitled to compensation in the Vaccine Program." *Id.* at 1. I granted Petitioner's motion and dismissed the petition on December 17, 2020. Decision, ECF No. 24.

On June 11, 2021, Petitioner filed a motion for attorneys' fees and costs, seeking **$12,231.00** in attorneys' fees and **$790.67** in costs for her attorney, Kimm Massey, and **$238.96** in total costs incurred by Petitioner. Pet'r's Mot. for AFC at 4, ECF No. 27-1. On June 21, 2021, Respondent filed his response in opposition to Petitioner's motion and argued that Petitioner's claim, "lacked a reasonable basis when filed, and one was never established." Resp't's Resp. at 9, ECF No. 28. Petitioner filed a reply brief on June 28, 2021, and noted "this claim was still at a

very early state when Petitioner became concerned about her ability to obtain expert support for her petition." Pet'r's Reply at 5, ECF No. 29. Petitioner continued that "it is a medical fact that the flu vaccine can trigger TM, and Respondent does not dispute that medical fact." *Id.* Therefore, she argued that "the existing evidentiary records contain[] sufficient objective evidence at this early stage of the case to demonstrate a reasonable basis for Petitioner's claim." *Id.* Petitioner renewed her motion on November 23, 2021. Pet'r's Second Mot. for AFC, ECF No. 30. This matter is now ripe for consideration.

## II.     Medical History

Petitioner does not dispute the timeline presented by Respondent with respect to her clinical progression. Indeed, Petitioner does not identify when her condition first manifested, although she otherwise responded to Respondent's opposition, wherein he argued her TM symptoms appeared over one year post vaccination. *See* Pet'r's Reply; *see also* Resp't's Resp. I have compared Respondent's account with the medical record and find it to be consistent. Therefore, I will adopt Respondent's history as detailed in his Rule 4(c) report. *See* Resp't's Report.

Petitioner was fifty-two years old at the time of the flu vaccination at issue, and her relevant prior medical history includes sciatica.[4] *See* Pet'r's Ex. 1 at 109–10, ECF No. 14-6. On October 19, 2016, during a routine annual physical, Petitioner reported "intermittent problems with right-sided sciatica[]" with right buttock pain that radiated down the leg. *Id.* at 108. She also denied numbness, tingling, or incontinence. *Id.* Petitioner received her Fluarix Quadrivalent flu vaccination during this examination. *Id.* at 113–14. She had received the flu vaccine three other times in the past five years, apparently without any adverse effects. *Id.* at 97, 112.

Petitioner saw her primary care provider ("PCP") in April and May of 2017 for recurrent problems with sciatic back pain radiating to the left lower extremity. *Id.* at 92, 100. Petitioner reported numbness and tingling in her left leg "that comes and goes." *Id.* at 100. Her PCP noted that Petitioner "previously had problems with sciatica on the right side, but that has mostly resolved." *Id.* Petitioner did not go to physical therapy ("PT") or schedule an MRI, as recommended. *Id.* at 92–100.

On September 28, 2017, Petitioner presented to the St. Agnes Hospital emergency department, complaining of dizziness, headache, and nausea shortly after waking up that morning. Pet'r's Ex. 3 at 15, ECF No. 14-21. She was diagnosed with probable benign paroxysmal positional

---

[4] Sciatica is "a syndrome characterized by pain radiating from the back into the buttock and along the posterior or lateral aspect of the lower limb; it is most often caused by protrusion of a low lumbar intervertebral disk. The term is also used to refer to pain anywhere along the course of the sciatic nerve." *Dorland's* at 1678.

vertigo,[5] and treaters performed the Epley maneuver.[6] *Id.* at 17, 19. Petitioner was discharged with a prescription for meclizine.[7] *Id.* at 19.

On October 30, 2017, over a year after the vaccination at issue, Petitioner returned to the St. Agnes Hospital emergency department, and reported that the previous Saturday, "she was at work when suddenly[,] she felt weakness in both of her legs." *Id.* at 201. Petitioner continued that she "was barely able to get herself in the car" and drive home. *Id.* Petitioner reported that the weakness then progressed, causing four falls in the previous two days. *Id.* She also noted that she was experiencing urinary incontinence for a few days and had not passed stool during this time. *Id.* Petitioner noted that she was seen in urgent care and was prescribed Percocet[8] and muscle relaxants, "without significant relief." *Id.* She also complained of "back pain shooting to her right legs down to [the] toes with associated numbness and tingling[.]" *Id.* Petitioner reported a history of right-sided sciatica diagnosed in 2016, which she stated was symptom-free until the last few months. *Id.* She was admitted for further evaluation. *Id.* at 203–04.

Following admission, Petitioner was evaluated by neurologist Milan Sanghavi, M.D., who recorded Petitioner's history of acute onset of bilateral lower extremity weakness and multiple falls starting on October 27, 2017. *Id.* at 195. Petitioner reported "having some [prior] lower back pain" with radiation into the right lower extremity in December of 2016. *Id.* She noted that her symptoms returned the following September, and she again experienced right lower extremity "buckling" that, at times, resulted in some falls. *Id.* On October 27, 2017, Petitioner began having bilateral lower extremity weakness and "difficulty getting to a standing position." *Id.* An examination revealed "normal strength in the upper extremities ("UE") and distal bilateral lower extremities ("LE"), but 3/5 strength in the proximal bilateral LE; decreased light touch and pinprick sensation up to the level of the groin bilaterally; reflexes 3+ throughout; and, non-sustained clonus[9] at the ankles." *Id.* at 196. Dr. Sanghavi noted that Petitioner had an MRI in the emergency department on October 30, 2017, "which showed diffuse central signal abnormality in the [spinal] cord consistent with myelopathy." *Id.* at 195. It also showed disc bulging at L4–5

---

[5] Benign paroxysmal positional vertigo is "recurrent brief periods of positional vertigo and nystagmus occurring when the head is placed in certain positions such as with one ear down. It is due to otolithiasis that causes exaggerated movement of the endolymph." *Dorland's* at 2051. Vertigo is "an illusory sense that either the environment or one's own body is revolving; it may result from diseases of the internal ear or may be due to disturbances of the vestibular centers or pathways in the central nervous system." *Id.*

[6] The Epley maneuver is "a series of head movements to relieve symptoms of benign positional vertigo . . . which is caused by a problem in the inner ear." *Epley Maneuver,* MEDLINE PLUS https://medlineplus.gov/ency/article/007662.htm (last visited Apr. 14, 2022).

[7] Meclizine is "an antihistamine used in the management of nausea, vomiting, and dizziness associated with motion sickness and of vertigo associated with disease affecting the vestibular system[.]" *Dorland's* at 1117.

[8] Percocet is the "trademark for a combination preparation of oxycodone hydrochloride and acetaminophen." *Dorland's* at 1409. Oxycodone hydrochloride is "an opioid agonist analgesic derived from morphine." *Id.* at 1356. Acetaminophen is "the amide of acetic acid and p-aminophenol, having analgesic and antipyretic effects similar to those of aspirin but only weak anti-inflammatory effects. Administered orally, rectally, and intravenously." *Id.* at 12.

[9] Clonus is "1. alternate muscular contraction and relaxation in rapid succession. 2. a continuous rhythmic reflex tremor initiated by the spinal cord below an area of spinal cord injury, set in motion by reflex testing." *Dorland's* at 373.

causing mild spinal stenosis. *Id.* at 322. The report from a repeat study with contrast the following day states, "[f]indings are nonspecific and may be secondary to inflammatory or infectious changes. [TM] is less likely due to long segment involvement." *Id.* at 327. Dr. Sanghavi reiterated that "[i]t was suspected that this [injury] was secondary to underlying infectious or inflammatory changes." *Id.* at 195. Dr. Sanghavi's impression was that Petitioner's clinical course "does appear extremely elongated for an episode of [TM]," and she noted that she would "have to rule out the possibility of an inflammatory or infectious etiology." *Id.* at 196. She started Petitioner on Solu-Medrol,[10] ordered a lumbar puncture and MRIs, and considered transferring her to a tertiary care center. *Id.* at 196–97.

On November 3, 2017, Petitioner was transferred to the University of Maryland Rehabilitation and Orthopaedic Institute, with an admitting diagnosis of incomplete spinal injury with useful motor function below the level of the lesion. Pet'r's Ex. 6 at 55, ECF No. 16-1. She was treated for neurogenic bowel and bladder,[11] acute pain of the bilateral shoulders (right greater than left), lower back, left knee, and bilateral hips due to her pre-hospitalization falls. *Id.* at 56. Petitioner also received treatment for spasticity with clonus of the bilateral lower extremities. *Id.* at 56–57. She was discharged on December 1, 2017. *Id.* at 64.

Petitioner returned to her PCP on December 8, 2017, and reported a "sudden onset of bilateral lower extremity weakness on [October 28, 2017,] while at work." Pet'r's Ex. 1 at 84. She noted that she had been getting PT at home, was using a rolling walker, a wheelchair when more fatigued, and crutches to go up and down stairs. *Id.* Petitioner also noted that she had right greater than left lower extremity weakness, but the numbness and tingling in her lower extremities were better. *Id.* She reported that she had knee pain, which she attributed to falling on her knees at the onset of her illness. *Id.*

On December 13, 2017, Petitioner saw Dr. Sanghavi for a follow-up and reported continued dysesthesias[12] in her legs. Pet'r's Ex. 6 at 29. She was "gaining strength on the left side but remained weak proximally [at 4/5]." *Id.* A motor examination of the bilateral upper extremities was normal, but an examination of the bilateral lower extremities showed spasticity with reduced hip range of motion and flexion. *Id.* at 30. Dr. Sanghavi assessed Petitioner with idiopathic TM, and recommended continued PT. *Id.*

### III. Legal Standard and Analysis

#### a. Compensation is Discretionary for Unsuccessful Claims

---

[10] Solu-Medrol is the "trademark preparation of methylprednisolone sodium succinate." *Dorland's* at 1731. Methylprednisolone sodium succinate is "the 21-succinate sodium salt of methylprednisolone, having actions and uses similar to those of the base; it is highly soluble in water and is chiefly used for the rapid achievement of high blood levels of methylprednisolone in short-term emergency treatment; administered by intramuscular or intravenous injection." *Id.* at 1154.
[11] Neurogenic bowel or bladder refers to "any condition of dysfunction of the urinary bladder [or bowel] caused by a lesion of the central or peripheral nervous system." *Dorland's* at 222.
[12] Dysesthesia is "1. distortion of any sense, especially of that of touch . . . 2. an unpleasant abnormal sensation produced by normal stimuli." *Dorland's* at 577.

Under the Vaccine Act, an award of reasonable attorneys' fees and costs is presumed where a petition for compensation is granted. Where compensation is denied, or a petition is dismissed, as it was in this case, a special master may award fees and costs for an unsuccessful petition if "the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought." 42 U.S.C. § 300aa–15(e)(1); *see also Sebelius v. Cloer*, 569 U.S. 369, 376 (2013). Petitioners act in "good faith" if they filed their claims with an honest belief that a vaccine injury occurred. *Turner v. Sec'y of Health & Hum. Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Respondent does not contest that this petition was filed in good faith. *See, e.g.*, Resp't's Resp. Without evidence of bad faith, I find that the good faith standard is met in this case.

       *b. Reasonable Basis*

To receive an award of fees and costs, a petitioner must also demonstrate the claim was brought with a reasonable basis through objective evidence supporting "the *claim* for which the petition was brought." *Simmons v. Sec'y of Health & Hum. Servs.,* 875 F.3d 632 (Fed. Cir. 2017); *see also Chuisano v. Sec'y of Health & Hum. Servs.*, 116 Fed. Cl. 276, 286 (2014) (citing *McKellar v. Sec'y of Health & Hum. Servs.,* 101 Fed. Cl. 297, 303 (2011)). "Reasonable basis" is not explicitly defined in the Vaccine Act or Rules. Section 15(e) of the Vaccine Act explains that the petition must include "an affidavit, and supporting documentation, demonstrating that the person who suffered such injury" received a covered vaccine in the United States; sustained a vaccine-caused injury that lasted more than six months; and has not collected damages in a previous claim. § 300aa–11(c)(1). Here, the parties' dispute centers on whether there is sufficient evidence of a vaccine-caused injury.

Deciding whether a claim has a reasonable basis "is within the discretion of the Special Master . . . ." *Simmons*, 875 F.3d at 632 (internal citations omitted). Reasonable basis can be present when a case is filed and can be lost as more information comes to light. *Chuisano*, 116 Fed. Cl. at 289.

A reasonable basis determination is based on a totality of the circumstances inquiry that can be satisfied by reviewing the factual, medical, and jurisdictional support for a claim.[13] *See Cottingham v. Sec'y of Health & Hum. Servs.*, 971 F.3d 1337, 1344–45 (Fed. Cir. 2020); *Chuisano*, 116 Fed. Cl. at 288. The amount of objective evidence that satisfies reasonable basis is more than a scintilla of evidence but less than preponderant evidence. *Cottingham*, 971 F.3d at 1344–45 (clarifying that "the failure to consider objective evidence presented in support of a reasonable basis for a claim would constitute an abuse of discretion."). Thus, petitioners must offer more than an unsupported assertion that a vaccine caused the injury alleged. *See, e.g.*, *Cortez v. Sec'y of Health & Hum. Servs.*, No. 09-176V, 2014 WL 1604002, at *5 (Fed. Cl. Spec. Mstr. Mar. 26, 2014); *McKellar*, 101 Fed. Cl. at 303–04. Special masters cannot broadly categorize all petitioner affidavits as subjective evidence or completely refuse to consider a petitioner's sworn statements when evaluating reasonable basis. *See James-Cornelius v. Sec'y of Health & Hum. Servs.,* 984 F.3d 1374, 1379–81 (Fed. Cir. 2021) (holding that factual testimony, when corroborated by medical records and a package insert, can amount to relevant objective evidence

---

[13] The jurisdictional support for Petitioner's claim is not at issue in this case and therefore, will not be addressed.

for supporting causation). However, a petitioner's own statements cannot alone support reasonable basis and special masters may make factual determinations as to the weight of evidence. *See, e.g., Chuisano*, 116 Fed. Cl. at 291; *Foster v. Sec'y of Health & Hum. Servs.*, No. 16-1714V, 2018 WL 774090, at *3 (Fed. Cl. Spec. Mstr. Jan. 2, 2018); *Cottingham*, 971 F.3d at 1347.

Petitioners must "affirmatively demonstrate [the] reasonable basis" of their claim through some objective evidentiary showing. *McKellar*, 101 Fed. Cl. at 305. The objective evidence in the record must also not be so contrary that a feasible claim is not possible. *Cottingham v. Sec'y of Health & Hum. Servs.*, 154 Fed. Cl. 790, 795 (2021) (citing *Randall v. Sec'y of Health & Hum. Servs.*, No. 18-448V, 2020 WL 7491210, at *12 (Fed. Cl. Spec. Mstr. Nov. 24, 2020) (finding no reasonable basis when petitioner alleged a SIRVA injury in his left arm though the medical records indicated that the vaccine was administered in the petitioner's right arm)). The Court of Appeals for the Federal Circuit and the Court of Federal Claims have held this includes the factual basis of the claim and any medical evidence supporting that claim. *See Cottingham*, 971 F.3d at 1344–45; *see also Chuisano*, 116 Fed. Cl. at 287 (finding that "the reasonable basis inquiry is broad enough to encompass any material submitted in support of the claim at any time in the proceeding, whether with the petition or later."). Indeed, a petitioner's "burden has been satisfied . . . where a petitioner has submitted a sworn statement, medical records, and [a] VAERS report which show that recovery is feasible." *Santacroce v. Sec'y of Health & Hum. Servs.*, No. 15-555V, 2018 WL 405121 at *6 (Fed. Cl. 2018) (citing *Turner*, 2007 WL 4410030, at *6). For purposes of establishing reasonable basis, medical records can support causation even where the records provide only circumstantial evidence of causation. *Cottingham*, 971 F.3d at 1346 (citing *Harding v. Sec'y of Dep't of Health & Hum. Servs.*, 146 Fed. Cl. 381, 403 (Fed. Cl. 2019)); *see also James-Cornelius*, 984 F.3d at 1374 (finding that "the lack of an express medical opinion on causation did not by itself negate the claim's reasonable basis."). After a review of the record, considering the totality of the circumstances, I find Petitioner's case lacked a reasonable basis at the time it was filed.

## IV.   Analysis

Respondent's argument against reasonable basis in this case is two-fold. First, Respondent argues that Petitioner has not provided any evidence to support a claim of vaccine-caused TM. Resp't's Resp. at 9. It is undisputed that Petitioner's medical records first mention a possible TM diagnosis in October of 2017, following symptoms of "bilateral lower limbs weakness that started suddenly on Saturday (2 days prior to [hospital] admission) in her thighs and then spread to her feet." Pet'r's Ex. 3 at 205. Her treating physician noted on October 30, 2017, that "[t]his does appear extremely elongated for an episode of [TM]." *Id.* at 196. In this notation, or any subsequent notation in Petitioner's medical record, there is nothing that connects Petitioner's October 19, 2016 flu vaccination, with her October 30, 2017 neurological symptoms or eventual TM diagnosis. Petitioner asserts that "the medical records [she] submitted in this case confirms [sic] that [she] received the flu vaccine and [] was later diagnosed with TM. Under these circumstances, the existing evidentiary records contains sufficient objective evidence at this early stage of the case to demonstrate a reasonable basis for Petitioner's claim." Pet'r's Reply at 5. This reasoning would allow for any individual who has received a flu vaccine and then at some subsequent, indeterminate point in time, developed TM, to file a claim in the Program. This argument does not even identify a reasonable temporal relationship.

Petitioner does not dispute that she has failed to file any supporting evidence of causation, and her evidence of two independent events (vaccination and illness) without any causal support, is not sufficient on its own. In the *Cottingham* decision, the Federal Circuit instructed special masters to consider all types of objective evidence to determine reasonable basis, including but not limited to medical records, witness affidavits, and vaccine package inserts. *See* 971 F.3d at 1344–45. The opinions of treating physicians, expert reports, medical literature, affidavits to illustrate symptom onset, and other anecdotal evidence can be, and are often, used as supporting evidence of causation. None of these items are required, but Petitioner must provide some evidence of causation. Proof of receipt of vaccination and a subsequent diagnosis of a condition, that may be vaccine-caused on rare occasions, is not enough.

Petitioner argues that "this claim was still at a very early stage." However, any review that occurred subsequent to the substitution of counsel to determine case viability could have been done prior to substitution. *See, e.g.*, *Rehn v. Sec'y of Health & Hum. Servs.*, No. 14-1012V, 2017 WL 1011487, at *6 (Fed. Cl. 2017) (finding that due to the presence of several "warning signals" regarding the claim's weakness, including prior counsel's motion to withdraw citing a lack of expert support, subsequent counsel did not exercise her duty to evaluate whether the petitioner's claim continued to have a reasonable basis before taking him on as a client.). In her reply to Respondent's opposition to attorneys' fees and costs, Petitioner describes her deadlines as tight. However, she filed her notice of counsel substitution weeks before the deadline. *See* ECF Nos. 10–11. Furthermore, I must note that petitioners in the Program often bemoan deadlines when making arguments for reasonable basis, despite the Federal Circuit's clear admonition that timing-related decisions are inherently subjective. Therefore, for example, "[w]hether there is a looming statute of limitations deadline[] has no bearing on whether there is a reasonable factual basis for the claim raised in the petition." *Simmons*, 875 F.3d at 636. Similarly, deadlines I set pursuant to a scheduling order have no relevance in a reasonable basis analysis. This is particularly true in this case, wherein I granted Petitioner's motion for extension of time filed on November 18, 2020. *See* Non-PDF Order, docketed Nov. 19, 2020. I must emphasize that the timing of Petitioner's decisions concerning when to submit filings had **no** impact on this decision, and I discuss timing here only to note that Petitioner's mention of the scheduling in this case is not instructive.

Second, Respondent contends that the delay of symptom onset following Petitioner's vaccination is too long for any reasonable conclusion that Petitioner's condition is related to her vaccination. Resp't's Resp. at 9. Again, Petitioner does not present any argument that Respondent's timeline is incorrect or misinterprets the record. Petitioner does not provide an alternative factual summary or reference medical records that record a different diagnosis chronology. My reading of the medical record is consistent with Respondent's. Indeed, a history of present illness notation contained in one record succinctly describes Petitioner's condition in October of 2017:

> Right[-]sided sciatica diagnosed in 2016, came in to the [emergency department] for frequent falls. Patient reports that last Saturday she was at work when suddenly she felt weakness in both her legs and was barely able to get herself in the car and dr[i]ve herself home. This weakness [] then progressed, it was described as bilateral in lower extremities that cause[d] her to fall down, she fell down 4 times in the last 2 days on her right shoulder, hips and back. There is associated urinary incontinence

> for the past few days which she never had before . . . Patient first diagnosed with sciatica back in 2016, she was then symptom[-]free until [the] last few months she started developing that again. She complains of back pain shooting to her right legs down to toes with associated numbness and tingling sensation.

Pet'r's Ex. 3 at 201. Petitioner was complaining of radiating pain, which she had previously been treated for. However, this is the first account of tingling and numbness. Additional records clarify this point. Petitioner's medical record also notes that her "bilateral lower limbs weakness [] started suddenly on Saturday[, October 28, 2017] (2 days prior to [hospital] admission) in her thighs and then spread to her feet." *Id.* at 305. A third record, dated October 31, 2017, notes "[p]atient presented with new acute neurological weakness [for two] days with multiple falls." *Id.* at 209. Petitioner has a prior history of sciatica described as radiating pain without numbness or tingling, which was recorded on October 19, 2016, the date of vaccination. Pet'r's Ex. 1 at 108. There is nothing in Petitioner's record to suggest that Petitioner's weakness, numbness, and tingling symptoms that are characteristic of TM, began prior to one year post vaccination.

Petitioner argues that it is reasonable to associate a TM diagnosis with a vaccination that occurred a year prior, with no contemporaneous symptoms. The record here is not contradictory or convoluted. This argument is unreasonable. In claims where special masters have found vaccine-caused demyelinating conditions, the appropriate temporal relationship is generally measured in days or weeks. *See, e.g.*, *Koller v. Sec'y of Health & Hum. Servs.,* No. 16-439V, 2021 WL 5027947 (Fed. Cl. Spec. Mstr. Oct. 8, 2021); *E.M. v. Sec'y of Health & Hum. Servs.,* No. 14-753V, 2021 WL 3477837, at *42 (Fed. Cl. Spec. Mstr. Jul. 9, 2021). Petitioner explained in her motion to dismiss that an examination of the facts and science revealed her claim would ultimately be unsuccessful. Pet'r's Mot. to Dismiss at 1. The record that Petitioner used to arrive at this conclusion was the medical record itself. The record at the time the claim was filed, and at every point in time thereafter, contained sufficient evidence of this delay in condition onset. Furthermore, Petitioner did not ever present objective evidence supporting that her TM was vaccine-caused.

## V.     Conclusion

I find that Petitioner has not alleged facts sufficiently supported by objective evidence to demonstrate a reasonable basis for her claim. To support a finding of reasonable basis, Petitioner must present more than evidence of a flu vaccination and a TM diagnosis, one year apart. Petitioner's claim of causation is insufficiently supported by the record. Therefore, I find there is insufficient evidence for a finding of reasonable basis. I hereby **DENY** Petitioner's motion for attorneys' fees and costs. In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of court is directed to enter judgment herewith.[14]

**IT IS SO ORDERED.**

s/Herbrina D. Sanders<br>
Herbrina D. Sanders<br>
Special Master

---

[14] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party, either separately or jointly, filing a notice renouncing the right to seek review.